**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
JOHN T. JASNOCH (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

*Attorneys for Plaintiff IBEW Local No. 640 and*
*Arizona Chapter NECA Pension Trust Fund*

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IBEW LOCAL NO. 640 AND ARIZONA CHAPTER NECA PENSION TRUST FUND, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:18-cv-04954 |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | JURY TRIAL DEMANDED |
| COLONY NORTHSTAR, INC., RICHARD B. SALTZMAN, DARREN J. TANGEN, NEALE REDINGTON, and DAVID T. HAMAMOTO, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff IBEW Local No. 640 and Arizona Chapter NECA Pension Trust Fund ("Plaintiff" or "IBEW 640"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned counsel, alleges the following based upon personal knowledge, as to Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, analyst and media reports, and other commentary analysis published by and regarding Colony NorthStar, Inc. ("Colony NorthStar" or the "Company"). Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants (defined below). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of a Class (defined below) consisting of all persons, other than Defendants, who purchased or otherwise acquired securities of Colony NorthStar between January 10, 2017 through March 1, 2018, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Colony NorthStar operates as a real estate investment trust. The Company invests in healthcare, industrial, and hospitality sectors, as well as offers equity and debt management services. Colony NorthStar serves customers globally. The Company resulted from the January 2017 merger of three entities: Colony Capital, Inc. ("Colony Capital"); NorthStar Asset Management Group Inc. ("NorthStar Asset"); and NorthStar Realty Finance Corp. ("NorthStar Realty").

3.      Colony NorthStar is headquartered in Los Angeles, California, and its stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CLNS."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies. Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) Colony NorthStar's Healthcare and Investment Management segments were performing worse than reported; and (ii) as a result, Colony NorthStar's public statements were materially false and misleading at all relevant times.

5.    On March 1, 2018, Colony NorthStar reported its financial and operating results for the quarter and year ended December 31, 2017, announcing a goodwill impairment of $375 million attributable to the Company's Healthcare and Investment Management segments.

6.    On this news, Colony NorthStar's share price fell $1.78, or 22.88%, to close at $6.00 on March 1, 2018.

7.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and members of the Class have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Colony NorthStar's principal executive offices are located within this District.

11.    In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and facilities of the national securities exchange.

# PARTIES

**A.    Plaintiff**

12.    Plaintiff IBEW 640, as set forth in the accompanying certification, purchased Colony NorthStar securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

**B.    Defendants**

13.    Defendant Colony NorthStar is incorporated in Maryland, and the Company's principal executive offices are located at 515 South Flower Street, 44th Street, Los Angeles, California 90071. Colony NorthStar's securities trade on the NYSE under the ticker "CLNS."

14.    Defendant Richard B. Saltzman ("Saltzman") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and as a member of the Board of Directors (the "Board").

15.    Defendant Darren J. Tangen ("Tangen") has served at all relevant times as the Company's Chief Financial Officer ("CFO"), Executive Vice President, and Treasurer, as well as a member of the Board.

16.    Defendant Neale Redington ("Redington") has served at all relevant times as the Company's Chief Accounting Officer ("CAO").

17.    Defendant David T. Hamamoto ("Hamamoto") served as the Company's Executive Vice Chairman until his resignation effective January 11, 2018.  He was previously Chairman and CEO of NorthStar Asset from January 2014 until August 2015, later becoming its Executive Chairman in August 2015.  Defendant Hamamoto was also Chairman of NorthStar Realty's board of directors from October 2007 until January 2017, having served as one of its directors since October 2003.  Defendant Hamamoto also served as NorthStar Realty's CEO from October 2004 until August 2015.  Defendant Hamamoto further served as Chairman of NorthStar Healthcare Income, Inc. ("NorthStar Healthcare") from January 2013 until January 2014.  He served as Co-Chairman of NorthStar/RXR New York Metro Real Estate Inc. ("NorthStar/RXR") from March 2014 until August 2015.  He co-founded NorthStar Capital Investment Corp., the predecessor to NorthStar Realty, for which he served as co-CEO until October 2004.

18.     The Defendants referenced in ¶¶14-17 are collectively referred to herein as "Individual Defendants."   Colony NorthStar and the Individual Defendants are collectively referred to herein as "Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of Colony NorthStar's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of the Company's SEC filings and press releases, alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with the Company, and their access to material information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### I.     BACKGROUND

20.     Colony NorthStar operates as a real estate investment trust.   The Company invests in healthcare, industrial, and hospitality sectors, as well as offers equity and debt management services. Colony NorthStar serves customers globally.

21.     Colony NorthStar was formed through a tri-party merger of Colony Capital, NorthStar Asset, and NorthStar Realty on or around January 10, 2017 (the "Merger").

### II.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

22.     On January 10, 2017, the Company issued a press release announcing the completion of the Merger (the "January 2017 Press Release").   In the release, Defendant Hamamoto stated that the Merger would benefit Colony NorthStar's combined stockholders "'with an even stronger value proposition through enhanced relationships, substantial efficiencies and synergies and greater scale in established, durable real estate and investment management business with broad-based capital access and investment opportunities.'"   The January 2017 Press Release also touted the combined Company's investment management platform:

> **World-Class Real Estate and Investment Management Platform:** Global, diversified equity REIT with $58 billion of assets under management, led by a seasoned management team with access to proprietary deal sourcing and a strong track record as a global investor, operator and investment manager.

The January 2017 Press Release additionally described the strong balance sheet and improved liquidity of the combined Company:

> **Stronger Balance Sheet and Improved Liquidity:** Approximately $24 billion balance sheet with significant excess liquidity expected from near-term asset monetizations which can be redeployed into new investments, to repurchase stock and/or to deleverage; targeting total debt-to-capitalization ratio of 50% or less with the goal of upgrading corporate credit profile and lowering overall cost of capital.

23.     On January 25, 2017, Colony NorthStar filed a Form 8-K with the SEC (the "January 2017 8-K") regarding the Company's "previously announced sale of an 18.7% interest in the Company's healthcare real estate portfolio . . . to Derwood Limited, in exchange for $350,000,000." The January 2017 8-K stated that the Company's healthcare real estate portfolio "is currently comprised of the Company's ownership interest, excluding existing minority interest holders, in 191 senior housing properties, 113 medical office properties, 14 hospitals and 107 skilled nursing facilities . . . represent[ing] an implied valuation . . . of approximately $5.4 billion[.]" The January 2017 8-K included the related "Purchase and Sale Agreement" and the "Unaudited Pro Forma Condensed Consolidated Financial Statements of Colony NorthStar[.]" The Unaudited Pro Forma Consolidated Balance Sheet, as of September 30, 2016, valued the combined Company's "Goodwill" at $1,063,028,000. The January 2017 8-K was signed by Defendant Tangen.

24.     On February 6, 2017, the Company issued a press release announcing that it would "release fourth quarter 2016 financial and operating results of its predecessor, NorthStar Asset[,] . . . after the market close on Tuesday, February 28, 2017[,]" along with "fourth quarter 2016 financial and operating results for Colony Capital . . . and NorthStar Realty[,] . . . which completed their merger with

5

[NorthStar Asset] in January 2017 to create Colony NorthStar, a leading global real estate and investment management firm."

25.    Then, on February 28, 2017, Colony NorthStar issued a press release, entitled "Colony NorthStar Announces Fourth Quarter 2016 Financial Results and Post-Merger Update," cutting "Core [Funds From Operations ("FFO")] guidance for the year ending 2017 to a range of $1.40 to $1.58 per share" and announcing it did "not intend to provide updates to Core FFO guidance going forward."  The Company expected lower earnings due to:

> 1) less third party capital raising; 2) less cash available to deploy into investments resulting from the increase of the [NorthStar Asset] special dividend among other reasons; and 3) accelerating the replacement of higher-yielding, non-core investments with lower-yielding investments that better fit the strategic direction of the Company.

26.    That same day, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2016 on Form 10-K (the "2016 10-K"), which provided the Company's annual financial results and position.  The 2016 10-K was signed by Defendants Saltzman, Tangen, Redington, and Hamamoto.  The 2016 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

27.    The 2016 10-K discussed the Company's five core strategic real estate segments, including its Healthcare and Investment Management segments:

> *Colony NorthStar segments*
>
> Our business objective is to provide attractive risk-adjusted returns to our investors through five core strategic real estate segments summarized as follows:
>
> - *Healthcare* - Our healthcare properties are comprised of a diverse portfolio of medical office buildings, senior housing, skilled nursing and other healthcare properties. Over half of our healthcare properties

6

are medical office buildings and properties structured under a net lease to healthcare operators. Substantially all of our net leases include annual escalating rent provisions. In addition, our portfolio consists of senior housing operating facilities which include healthcare properties that operate through management agreements with independent third-party operators, predominantly through structures permitted by the REIT Investment Diversification and Empowerment Act of 2007, or RIDEA, structures that permit us, through a taxable REIT subsidiary, or TRS, to have direct exposure to resident fee income and incur customary related operating expenses. Our medical office buildings are a combination of single tenant and multi-tenant properties typically structured with long-term leases with the tenants.

* * *

- *Investment Management* - Our investment management business is expected to generate fee income through investment management services, sponsoring numerous investment products across a diverse set of institutional and retail investors.

28.    On May 10, 2017, the Company filed a Form 10-Q with the SEC for the quarter ended March 31, 2017 (the "1Q 2017 10-Q"), which provided the Company's first quarter 2017 financial results and position. The 1Q 2017 10-Q was signed by Defendants Saltzman, Tangen, and Redington.

29.    The 1Q 2017 10-Q contained signed SOX certifications by Defendants Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

30.    The 1Q 2017 10-Q discussed the Company's five reportable segments, including Healthcare and Investment Management, stating, in relevant part:

- *Healthcare*—The Company's healthcare segment is composed of a diverse portfolio of medical office buildings, senior housing, skilled nursing and other healthcare properties. The Company earns rental

7

income from medical office buildings and properties structured under net leases to healthcare operators, and resident fee income from senior housing operating facilities that operate through management agreements with independent third-party operators.

* * *

- *Investment Management*—The Company generates fee income through investment management services, sponsoring numerous investment products across a diverse set of institutional and retail investors.

31.    The Company further described its Healthcare segment interests in the 1Q 2017 10-Q, stating, in relevant part:

**Healthcare**

* * *

In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 18.7% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 87.7% of our healthcare portfolio, with the remaining 12.3% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs of our healthcare portfolio.

At March 31, 2017, our interest in our healthcare segment was approximately 71.3%.

Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on facility count) is in the United Kingdom.

The following table presents selected operating metrics of our healthcare segment at March 31, 2017:

8

| Type | Number of Properties / Facilities | Capacity | | Average Occupancy [1] | Average Remaining Lease Term (Years) | NOI for the Three Months Ended March 31, 2017 (in thousands) |
|---|---|---|---|---|---|---|
| Medical office buildings | 113 | 4.02 million | square feet | 85.1% | 5.1 | $ 11,974 |
| Senior housing—operating | 109 | 6,436 | units | 86.8% | NA | 16,314 |
| Net lease—senior housing | 82 | 4,065 | units | 85.7% | 11.5 | 12,461 |
| Net lease—skilled nursing facilities | 107 | 12,794 | beds | 84.2% | 7.6 | 25,384 |
| Net lease—hospitals | 14 | 817 | beds | 60.9% | 12.0 | 4,995 |
| Total | 425 | | | 83.6% | 9.5 | $ 71,128 |

[1]  Occupancy represents property operator's patient occupancy for all types except medical office buildings. Average occupancy is based on number of units, beds or square footage by type of facility. Occupancy percentage is as of the last day of the quarter presented for medical office buildings, average of the quarter presented for senior housing—operating, and average of the prior quarter for net lease properties.

* * *

Subsequent to the Merger, we sold one medical office building for net proceeds of $3.1 million. At March 31, 2017, we had one portfolio and two skilled nursing facilities held for sale, with an aggregate real estate carrying value of $228.6 million and corresponding debt carrying value of $150.7 million. These activities reflect our continued asset monetization initiatives.

32.    The Company further described in its 1Q 2017 10-Q its Investment Management segment and the extent to which NorthStar Asset Management Group Inc. contributed to this segment, stating in relevant part:

***Investment Management***

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

9

For the three months ended March 31, 2017, we closed on approximately $980 million of third party capital commitments, with $940 million from institutional clients and $40 million from retail clients.

Total third party assets under management ("AUM") were as follows:

| (In billions) | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [(1)] | $40.7 | $10.7 |

The acquisition of [NorthStar Asset]'s investment management business contributed $30.9 billion of our third party AUM at March 31, 2017. In the first quarter of 2017, Colony's third party AUM decreased approximately $0.9 billion, due to continued realization of investments by liquidating funds, including the sale of shares in Colony Starwood Homes held by our managed funds, partially offset by new capital raised during this period.

Our third party AUM at March 31, 2017 by type is summarized below:

| Type | Products | Description | AUM (in billions) |
|---|---|---|---|
| Institutional Funds | Credit funds, opportunistic funds, value-add funds, Colony industrial open end fund, other co-investment vehicles and special accounts | Earns base and asset management fees, potential for incentives on sponsored funds | $ 10.2 |
| Retail Companies | NorthStar Income I, NorthStar Income II | Public non-traded REITs and investment companies | 7.0 |
| | NorthStar Healthcare | Broker-dealer subsidiary acts as dealer-manager for all retail product offerings | |
| | NorthStar/RXR NY Metro [(1)] | Earns base management fees from all Retail Companies, acquisition and disposition fees from non-traded REITs (except for NorthStar/RXR NY Metro), and potential for performance fees (except for NorthStar/Townsend) | |
| | NorthStar Capital Fund | | |
| | NorthStar/Townsend [(1)(2)] | | |
| Public Companies | NorthStar Realty Europe Corp. | NYSE-listed European equity REIT | 2.0 |
| | | Earns base management fees, potential for incentives | |
| Townsend | Commingled funds, segregated mandates, advisory services | 84% interest in Townsend group | 14.5 |
| | | Manage fund-of-funds and custom portfolios primarily invested in direct real estate funds | |
| | | Source co-investments and joint ventures alongside GPs | |
| | | Earns base management fees, performance fees, advisory fees | |
| Pro Rata Corporate Investments | Joint venture investments | Earns share of earnings from unconsolidated ventures | 7.0 |
| | | Includes investments in RXR Realty (27%), real estate owner, developer and asset manager with AUM over $12 billion; and (ii) AHI (43%), healthcare asset manager and sponsor of non-traded vehicles with AUM of $2.5 billion | |
| | | | $ 40.7 |

33.    On August 9, 2017, the Company filed a Form 10-Q with the SEC for the quarter ended June 30, 2017 (the "2Q 2017 10-Q"), which provided the Company's second quarter 2017 financial results and position.  The 2Q 2017 10-Q was signed by Defendants Saltzman, Tangen, and Redington.

34.    The 2Q 2017 10-Q contained signed SOX certifications by Defendants Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

35.    The 2Q 2017 10-Q discussed the Company's desire to sell certain Healthcare segment assets, stating, in relevant part:

> **Healthcare**
>
> * * *
>
> In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 18.7% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 87.7% of our healthcare portfolio, with the remaining 12.3% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs of our healthcare portfolio.
>
> At June 30, 2017, our interest in our healthcare segment was approximately 71.3%.
>
> Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on property count) is in the United Kingdom.
>
> The following table presents selected operating metrics of our healthcare segment:

| Type | Number of Buildings at June 30, 2017 | Capacity at June 30, 2017 | | Average Occupancy[(1)] | Average Remaining Lease Term (Years) | NOI for the Three Months Ended June 30, 2017 (In thousands) | | NOI for the Six Months Ended June 30, 2017 (In thousands) | |
|---|---|---|---|---|---|---|---|---|---|
| Medical office buildings | 113 | 4.02 million | square feet | 84.0% | 5.0 | $ | 14,408 | $ | 26,382 |
| Senior housing—operating | 109 | 6,436 | units | 86.7% | N/A | | 19,418 | | 35,732 |
| Net lease—senior housing | 82 | 4,065 | units | 83.6% | 11.3 | | 14,407 | | 26,868 |
| Net lease—skilled nursing facilities | 107 | 12,794 | beds | 83.4% | 7.7 | | 24,904 | | 50,288 |
| Net lease—hospitals | 14 | 872 | beds | 63.4% | 11.9 | | 5,375 | | 10,370 |
| Total | 425 | | | 83.0% | 9.4 | $ | 78,512 | $ | 149,640 |

> * * *

11

Subsequent to the Merger, we sold one medical office building for net proceeds of $3.1 million. At June 30, 2017, we had one portfolio, five medical office buildings and two skilled nursing facilities held for sale, with an aggregate real estate carrying value of $228.8 million and corresponding debt carrying value of $168.7 million. These activities reflect our continued asset monetization initiatives.

36.    The Company further described in its 2Q 2017 10-Q its Investment Management segment and the extent to which NorthStar Asset contributed to this segment, stating, in relevant part:

### Investment Management

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the six months ended June 30, 2017, we closed on approximately $1.4 billion of third party capital commitments, including our pro rata share from equity method investments in third party asset managers.

Our total third party assets under management ("AUM") were as follows:

| (In billions) | June 30, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [(1)] | $40.3 | $10.7 |

The acquisition of [NorthStar Asset]'s investment management business contributed $30.7 billion of our third party AUM at June 30, 2017. In the six months ended June 30, 2017, Colony's third party AUM decreased

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:18-CV-04954

$1.1 billion, due to continued realization of investments by liquidating funds, including the sale of shares in SFR held by our managed funds.

Our third party AUM at June 30, 2017 by type is summarized below:

| Type | Products | Description | AUM (in billions) |
|---|---|---|---|
| Institutional Funds | Credit funds, opportunistic funds, value-add funds, Colony industrial open end fund, other co-investment vehicles and special accounts | Earns base and asset management fees, potential for incentives on sponsored funds | $ 10.0 |
| Retail Companies | NorthStar Income I, NorthStar Income II | Public non-traded REITs and investment companies | 6.9 |
| | NorthStar Healthcare | Broker-dealer subsidiary acts as dealer-manager for all retail product offerings | |
| | NorthStar/RXR NY Metro [1] | Earns base management fees from all retail companies, acquisition and disposition fees from non-traded REITs (except for NorthStar/RXR NY Metro), and potential for performance fees (except for NorthStar/Townsend) | |
| | NorthStar Capital Fund | | |
| | NorthStar/Townsend [1] [2] | | |
| Public Companies | NorthStar Realty Europe Corp. | NYSE-listed European equity REIT | 2.1 |
| | | Earns base management fees, potential for incentives | |
| Townsend [3] | Commingled funds, segregated mandates, advisory services | 84% interest in Townsend group | 14.2 |
| | | Manage fund-of-funds and custom portfolios primarily invested in direct real estate funds | |
| | | Source co-investments and joint ventures alongside GPs | |
| | | Earns base management fees, performance fees, advisory fees | |
| Pro Rata Corporate Investments | Joint venture investments | Earns share of earnings from unconsolidated ventures | 7.1 |
| | | Includes investments in RXR Realty (27% interest), a real estate owner, developer and asset manager with AUM over $12 billion; and AHI (43% interest), a healthcare asset manager and sponsor of non-traded vehicles with AUM of $2.9 billion | |
| | | | $ 40.3 |

37.    On November 9, 2017, the Company filed a Form 10-Q with the SEC for the quarter ended September 30, 2017 (the "3Q 2017 10-Q"), which provided the Company's third quarter 2017 financial results and position.  The 3Q 2017 10-Q was signed by Defendants Saltzman, Tangen, and Redington.

38.    The 3Q 2017 10-Q contained signed SOX certifications by Defendants Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

39.    The 3Q 2017 10-Q discussed the Company's desire to sell certain "non-core" Healthcare segment assets, stating, in relevant part:

*Investment Management*

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:18-CV-04954

income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the nine months ended September 30, 2017, we closed on approximately $1.7 billion of third party capital commitments, including our pro rata share from equity method investments in third party asset managers.

Our total third party assets under management ("AUM") were as follows:

| (In billions) | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [1] | $41.7 | $10.7 |

The acquisition of [NorthStar Asset]'s investment management business, including Townsend and NSAM's investments in third party asset managers, contributed $31.5 billion of our third party AUM at September 30, 2017. Colony's third party AUM of $10.2 billion at September 30, 2017 decreased $0.4 billion from December 31, 2016 due to continued realization of investments by liquidating funds, including the sale of shares in SFR held by our managed funds, partially offset by the July 2017 acquisition of the THL Hotel Portfolio which is co-invested with our managed funds, as well as the acquisition and subsequent syndication of a California office building investment to third party investors in September 2017.

40.     That same day, the Company held an earnings call for the third quarter of 2017.  On the call, Defendant Tangen stated that the Company "ended the quarter with a slightly smaller healthcare portfolio, 417 properties compared to 425 last quarter as a result of our ongoing selective portfolio pruning."

14

41.     The statements referenced in ¶¶33-39 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Colony NorthStar's Healthcare and Investment Management segments were performing worse than reported; and (ii) as a result, Colony NorthStar's public statements were materially false and misleading at all relevant times.

## III.    THE TRUTH BEGINS TO EMERGE

42.     On March 1, 2018, the Company filed its annual report with the SEC for the fourth quarter and full year ended December 31, 2017 ("2017 10-K"), which announced a goodwill impairment of $375 million attributable to the Company's Investment Management segment.   Specifically, the Company's impaired goodwill related to its investment management reporting unit, NorthStar Healthcare, and NorthStar/RXR.  The 2017 10-K stated, in relevant part:

> *Investment Management*—The impairment recognized in 2017 consisted of the following:
>
> - $316.0 million write-down in goodwill, which represents the excess in carrying value of our investment management reporting unit, including its assigned goodwill, over its estimated fair value . . .; and
>
> - write-down of management contract intangibles for non-traded REITs that were acquired through the Merger, specifically $55.3 million for NorthStar Healthcare . . . based on an amendment to its advisory agreement as part of our efforts to preserve liquidity in NorthStar Healthcare and $3.7 million for NorthStar/RXR . . . based on revised capital raising projections.

43.     During the earnings call held that same day, Defendant Saltzman stated, in relevant part:
> On the other hand, our earnings performance has not lived up to expectations, emanating from more challenging industry conditions in

health care, real estate as well as our retail broker dealer distribution business.

* * *

Retail broker-dealer distribution was another area of very disappointing results. The industry generally remains [in] an enormous transition from major regulatory headwinds, including the newly implemented fiduciary rule as well as a change in product constructs, more conservative 40 Act and interval funds that operate with less leverage and offer more liquidity options.

44.    Further, during the same earnings call, Defendant Tangen stated, in relevant part:

A few material accounting items to mention during the fourth quarter that impacted our GAAP results: We recorded a goodwill impairment of $316 million to reflect a lower value in our investment management business, primarily attributable to our retail broker-dealer distribution business. And we also wrote down management agreement intangible assets by $35 million to reflect amendments to our management agreement in our health care non-traded REIT, NHI, net of deferred tax impact.

45.    On this news, Colony NorthStar's share price fell $1.78, or 22.88%, to close at $6.00 on March 1, 2018.

46.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and members of the Class have suffered significant losses and damages.

## IV.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

47.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all those who purchased or otherwise acquired Colony NorthStar securities traded on the NYSE during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of

16

1  their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in

2  which Defendants have or had a controlling interest.

3          48.    The members of the Class are so numerous that joinder of all members is impracticable.

4  Throughout the Class Period, Colony NorthStar securities were actively traded on the NYSE.  While the

5  exact number of Class members is unknown to Plaintiff at this time, and can be ascertained only through

6  appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the

7  proposed Class.  Record owners and other members of the Class may be identified from records

8  maintained by Colony NorthStar or its transfer agent and may be notified of the pendency of this action

9  by mail, using the form of notice similar to that customarily used in securities class actions.

10          49.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of

11  the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is

12  complained of herein.

13          50.    Plaintiff will fairly and adequately protect the interests of the members of the Class and

14  has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no

15  interests antagonistic to or in conflict with those of the Class.

16          51.    Common questions of law and fact exist, as to all members of the Class, and predominate

17  over any questions solely affecting individual members of the Class.  Among the questions of law and

18  fact common to the Class are:

19        •  whether the federal securities laws were violated by Defendants' acts, as alleged

20           herein;

21        •  whether statements made by Defendants to the investing public during the Class

22           Period misrepresented material facts about the financial condition, business,

23           operations, and management of Colony NorthStar;

24        •  whether Defendants caused Colony NorthStar to issue false and misleading financial

25           statements during the Class Period;

26        •  whether Defendants acted knowingly or recklessly in issuing false and misleading

27           financial statements;

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:18-CV-04954

- whether the prices of Colony NorthStar securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

53.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Colony NorthStar securities are traded in efficient markets;

- Colony NorthStar's shares were liquid and traded with moderate to heavy volume during the Class Period;

- Colony NorthStar traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Colony NorthStar securities; and

- Plaintiff and members of the Class purchased and/or sold Colony NorthStar securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

54.    Based upon the foregoing, Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55.    Alternatively, Plaintiff and members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*,

18

406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### FIRST CLAIM
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     This Claim is asserted against Colony NorthStar and the Individual Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.     During the Class Period, Colony NorthStar and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew, or deliberately disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.     Colony NorthStar and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes, and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Colony NorthStar securities during the Class Period.

60.     Colony NorthStar and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Colony NorthStar were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

19

These Defendants, by virtue of their receipt of information reflecting the true facts of Colony NorthStar, their control over, and/or receipt and/or modification of the alleged materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Colony NorthStar, participated in the fraudulent scheme alleged herein.

61.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above and intended to deceive Plaintiff and members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Colony NorthStar personnel to members of the investing public, including Plaintiff and members of the Class.

62.    As a result of the foregoing, the market price of Colony NorthStar securities was artificially inflated during the Class Period.  In ignorance of the falsity of Colony NorthStar's and the Individual Defendants' statements, Plaintiff and members of the Class relied on the statements described above and/or the integrity of the market price of Colony NorthStar securities during the Class Period in purchasing Colony NorthStar securities at prices that were artificially inflated as a result of Colony NorthStar's and the Individual Defendants' false and misleading statements.

63.    Had Plaintiff and members of the Class been aware that the market price of Colony NorthStar securities had been artificially and falsely inflated by Colony NorthStar's and the Individual Defendants' misleading statements, and by the material adverse information which Colony NorthStar and the Individual Defendants did not disclose, they would not have purchased Colony NorthStar securities at the artificially inflated prices that they did, or at all.

64.    As a result of the wrongful conduct alleged herein, Plaintiff and members of the Class have suffered damages in an amount to be established at trial.

65.    By reason of the foregoing, Colony NorthStar and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and members of the Class for substantial damages that they suffered in connection with their purchase of Colony NorthStar securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

66.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.    This Claim is asserted against the Individual Defendants and is based upon §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

68.    During the Class Period, the Individual Defendants participated in the operation and management of Colony NorthStar and conducted and participated, directly and indirectly, in the conduct of Colony NorthStar's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

69.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, with respect to Colony NorthStar's financial condition and results of operations, and to correct promptly any public statements issued by Colony NorthStar that had become materially false or misleading.

70.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that Colony NorthStar disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Colony NorthStar to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Colony NorthStar within the meaning of §20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged herein that artificially inflated the market price of Colony NorthStar securities.

71.    By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Colony NorthStar.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring this action to be a proper class action under Fed. R. Civ. P. 23 and certifying Plaintiff as a Class Representative;

B.      Awarding Plaintiff and members of the Class compensatory damages;

D.      Awarding Plaintiff and members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.      Awarding Plaintiff and members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 4, 2018               **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                          /s/ John T. Jasnoch
                        John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508

– and –

Donald A. Broggi
dbroggi@scott-scott.com
Thomas L. Laughlin, IV (*pro hac vice* forthcoming)
tlaughlin@scott-scott.com
Rhiana L. Swartz (*pro hac vice* forthcoming)
rswartz@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334

***Attorneys for Plaintiff IBEW Local No. 640 and Arizona Chapter NECA Pension Trust Fund***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:18-CV-04954

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Dean Wine, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Trustee of IBEW Local No. 640 and Arizona Chapter NECA Pension Trust Fund ("IBEW 640") and I am duly authorized to act on behalf of IBEW 640.

2.      I have reviewed the Complaint in this matter and authorize Scott+Scott, Attorneys at Law, LLP to file the Complaint and lead plaintiff papers in this matter on behalf of IBEW 640.

3.      IBEW 640 is willing to serve as a representative party on behalf of the purchasers of Colony NorthStar, Inc. ("Colony NorthStar") securities during the Class Period, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period, IBEW 640 purchased and/or sold the security that is the subject of the Complaint, as set forth in the attached **Schedule A**.

5.      IBEW 640 did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Exchange Act of 1934 (the "Exchange Act").

6.      IBEW 640 has not sought to serve as a representative party or lead plaintiff on behalf of a class in a private action arising under the Exchange Act during the three-year period preceding the date on which this certification is signed.

7.      IBEW 640 will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at _PHOENIX, AZ_____. (City, State)

IBEW LOCAL NO. 640 AND ARIZONA
CHAPTER NECA PENSION TRUST
FUND

_6-4-18_
Date

Dean Wine
Trustee

2

# Schedule A

**COLONY NORTHSTAR INC-CLASS A**          **Ticker:**  **CLNS**          **Cusip:**   **19625W104**

Class Period: 01/10/2017 to 03/01/2018

**IBEW Local #640 & Arizona Chapter NECA**

| | DATE | SHARES | PRICE |
|---|---|---|---|
| Purchases: | 2/21/2017 | 4,100 | $14.19 |
| | 2/21/2017 | 2,100 | $14.20 |
| | 2/21/2017 | 1,500 | $14.20 |
| | 2/22/2017 | 6,600 | $14.21 |
| | 2/22/2017 | 4,700 | $14.21 |
| | 2/22/2017 | 3,400 | $14.22 |
| | 2/22/2017 | 2,400 | $14.22 |
| | 3/3/2017 | 4,185 | $13.69 |
| | 3/3/2017 | 2,340 | $13.69 |
| | 3/3/2017 | 725 | $13.61 |
| | 3/3/2017 | 405 | $13.61 |
| | 3/6/2017 | 1,000 | $13.75 |
| | 3/6/2017 | 600 | $13.78 |
| | 3/6/2017 | 500 | $13.75 |
| | 3/6/2017 | 400 | $13.78 |
| | 3/8/2017 | 1,190 | $13.65 |
| | 3/8/2017 | 655 | $13.65 |
| | 4/5/2017 | 2,200 | $12.69 |
| | 4/5/2017 | 1,200 | $12.69 |
| | 4/6/2017 | 1,900 | $12.63 |
| | 4/6/2017 | 1,100 | $12.63 |
| | 11/30/2017 | 4,510 | $12.21 |
| | 11/30/2017 | 2,775 | $12.21 |
| | 11/30/2017 | 1,340 | $12.17 |
| | 11/30/2017 | 825 | $12.17 |